# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**IRVING CORTEZ-HERNANDEZ**

    Plaintiff

           **v.**                         **Civil No. 09-1333 (SEC)**

**CENTENNIAL PUERTO RICO**

    Defendant

## OPINION AND ORDER

Pending before the Court is Defendant Centennial Puerto Rico's ("Defendant" or "Centennial") Motion for Summary Judgment (Docket # 36), and Plaintiff Irving Cortez-Hernandez's ("Plaintiff" or "Cortez") opposition thereto (Docket # 44). Defendant replied (Docket # 51), and Plaintiff sur-replied (Docket # 56). After carefully considering the filings and the applicable law, Defendant's motion  is **GRANTED**.

**Procedural Background**

On April 8, 2009, Plaintiff filed the present suit under Title VII, the Constitution of the Commonwealth of Puerto Rico, and several state laws, alleging that Defendant discriminated against him, and eventually terminated him because of his religious beliefs.  Docket # 1. After discovery concluded, Defendant filed the present motion arguing that Plaintiff failed to set forth a *prima facie* case of religious discrimination, or show that Defendant's proffered reason for his dismissal was a pretext for discrimination. Defendant further contends that Plaintiff was terminated for legitimate business reasons, *i.e.*, Plaintiff's misconduct. Lastly, Defendant avers that the record is devoid of evidence showing that Plaintiff suffered discrimination because of his religious beliefs. Plaintiff opposed, arguing that Defendant conspired against him due to his religious beliefs, and dismissed him despite his excellent performance. According to Plaintiff, he was terminated solely because of his religion.

**Standard of Review**

The Court may grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ramírez Rodríguez v. Boehringer Ingelheim, 425 F.3d 67, 77 (1st Cir. 2005). In reaching such a determination, the Court may not weigh the evidence. Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994). At this stage, the court examines the record in the "light most favorable to the nonmovant," and indulges all "reasonable inferences in that party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

Once the movant has averred that there is an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant to establish the existence of at least one fact in issue that is both genuine and material. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (citations omitted). "A factual issue is 'genuine' if 'it may reasonably be resolved in favor of either party and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" DePoutout v. Raffaelly, 424 F.3d 112, 116 (1st Cir. 2005)(citing Garside, 895 F.2d at 48 (1st Cir. 1990)); see also SEC v. Ficken, 546 F.3d 45, 51 (1st Cir. 2008).

In order to defeat summary judgment, the opposing party may not rest on conclusory allegations, improbable inferences, and unsupported speculation. See Hadfield v. McDonough, 407 F.3d 11, 15 (1st Cir. 2005) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish a genuine issue of material fact. Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997). Once the party moving for summary judgment has established an absence of material facts in dispute, and

that he or she is entitled to judgment as a matter of law, the "party opposing summary judgment must present definite, competent evidence to rebut the motion." Méndez-Laboy v. Abbot Lab., 424 F.3d 35, 37 (1st Cir. 2005) (citing Maldonado-Denis v. Castillo Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

"The non-movant must 'produce specific facts, in suitable evidentiary form' sufficient to limn a trial-worthy issue. . . .   Failure to do so allows the summary judgment engine to operate at full throttle." Id.; see also Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); Medina-Muñoz, 896 F.2d at 8 (citing Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)) (holding that "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve.").

**Applicable Law and Analysis**

The relevant uncontested facts are as follows.

*Centennial's Policies and Procedures*

Centennial is a corporation dedicated to providing broadline and wireless communications services. Defendant's Statement of Uncontested Facts ("SUF") ¶ 1. Centennial is also an Equal Opportunity Employer.  Id. at 2. During all periods relevant to the above-captioned complaint, Centennial maintained an antidiscrimination policy that proscribes discrimination based on an employee's race, color, religion, age, sex, disability, or any other illegal motive in the workplace, as provided in Centennial's Associates Manual. Id. Said anti-discrimination and anti-harassment policies were published during all relevant periods in conspicuous places within the Company including bulleting boards, employee lounges and Centennial's intranet. Id. at 6. Also, while Plaintiff worked at Centennial, the Company posted signs and posters at all work areas publicizing

to its employees all applicable employment legislation, including antidiscrimination statutes, as required by law. Id.

Centennial also strives to provide all of its employees with a safe work environment, free of harassment, hostility and violence, where all employees and customers are treated with dignity and respect. Id. at 3. Depending on the nature and severity of the transgressions, violations to the policies contained in Centennial's Associates Manual could be penalized with termination. Id. at 4. According to the Associates Manual, an employee must show good judgment, consideration of others and respect at the workplace. Id. at 5. If an employee's conduct affects the workplace, the employee may be disciplined by verbal warnings, written warnings, suspension, or termination, depending on the seriousness of conduct, and taking into consideration said employee's record, the effect on customers and/or other employees and other surrounding circumstances. Id.

Since 2005, Centennial has terminated more than 500 employees. Plaintiff's Additional Uncontested Facts ("AUF") ¶ 1.

*Cortez's Work History*

Cortez started working at Centennial on December 10, 1997, as an Inside Sales Representative ("ISR") in Mayagüez. SUF at 7.[1] Throughout his employment with Centennial he always held the ISR position. Id. Plaintiff worked in Centennial's kiosks until 2004; thereafter, he worked at the Centennial store located in the Mayagüez Mall. Id. As an ISR, Cortez's main responsibility was to sell Centennial's services and products at its stores and sales kiosks. Id. He worked at Centennial for more than a decade. AUF at 1.

In April 2005, Cortez reported that Lymarie Torres ('Torres"), another ISR at the

---

[1]   Before working at Centennial, Plaintiff worked as a bar bouncer. Id. at 89. While he worked as a bouncer he was involved in fights because he "had to defend himself." Id. According to the Puerto Rico Courts Case Management Site, Plaintiff was accused of aggravated assault on October 27, 1997 in Case No. A1CR970196. Id. at 90.

Mayagüez store, misappropriated commissions from a sale performed by him. AUF at 8.  After an inquiry on this matter, on April 25, 2005, the Human Resources Department issued a Summary Report, prepared and signed by Ángela Ramos Jackson ("Ramos"), Centennial's Human Resources Senior Manager. Id. Pursuant to the report, Torres was confronted by her supervisor at the time, Milca Maldonado, to discuss the incident alleged by Cortez, as well as three (3) other similar incidents. Id.  Based upon Torres and Cortez's statements, the report concluded that Torres had engaged in misconduct and that the commissions in controversy should be assigned to Cortez. Id. Accordingly, the report stated that Torres would be notified of the outcome of the investigation. Id.

*Human Resources' Investigation*

Ramos was Centennial's Human Resources Senior Manager until March 9, 2010. SUF at 9. As part of her responsibilities, Ramos dealt with discipline counseling, internal grievances and investigations, involuntary terminations, recruitment, and the supervision of Centennial's human resources personnel. Id. Leslie Vélez ("Vélez") was, at all times relevant to this complaint, and currently continues to work as Centennial's Human Resources Specialist. Id. at 10. She counsels management in, among other matters, the application of Centennial's antidiscrimination and antiharassment policies and the determination of appropriate counseling and/or discipline for employees. Id. She also conducts internal investigations of complaints presented to the Human Resources Department via calls, letters or through the channels provided in Centennial's antidiscrimination and antiharassment policies. Id. As part of these investigations, Vélez interviews the employees that may have information pertinent to the investigation, takes notes of the interview, and asks the employees/witnesses to review her notes and sign them if they reflect what was stated during the interview. Id. at 11. These notes are then used in considering the appropriate measures to be applied. Id.

From March to April 2008, the Human Resources Department received three (3) complaints from employees in the Mayagüez Store related to their work environment. Id. at 12. The first letter dated March 13, 2008 was sent by Torres, who complained, among others, that Cortez was harassing her. Id. at 13. Prior to this letter, there were no complaints filed against Cortez. AUF at 4. Jeffrey De Jesús ("De Jesús"), Manager of the Mayagüez Store, sent Torres' complaint to his direct supervisor, Darío Cátala ("Cátala"), Area Sales Director and to Vélez. SUF at 13. De Jesús asked Human Resources to promptly intervene and investigate Torres' complaint because the situation between Torres and Cortez was getting out of hand. Id.

In her letter, Torres complained that Cortez and another employee, Sandra Quiñones ("Quiñones") harassed her. Id. at 15. Therein, she provided the following statements as examples of harassment: Cortez was constantly checking all of her work and accessing her client's accounts to scrutinize her transactions; if Cortez noticed Torres' client's credit was not good, he would say that his "shadows" were working very well ("mis sombras están trabajando muy bien"); if in turn, the credit was good, Cortez would access her accounts to verify if Torres did everything correctly; Cortez accused Torres of stealing clients in front of clients while she was assisting them, for example, he would ask clients: "did you ask her about me? because she is crazy about stealing my sales"("le preguntaste por mi a ella? porque es loca tumbandome los clientes"); Cortez told one of Torres' clients that he was behind in sales, and asked the client to please open the account through him and when Torres returned the next day, the client told her that she was going to open the account through Cortez because she felt sorry for him; and Cortez would try to turn her co-workers against her. Id. at 15. Torres also surprised Cortez and Quiñones in her computer taking notes of her sales and the accounts she managed. Id. In the letter, Torres also stated that she felt harassed, that the situation was becoming intolerable and was affecting her performance. Id.

When De Jesús forwarded the complaint to Cátala and Vélez via electronic mail, he commented that Cortez constantly monitored Torres' actions at the store; tried to intimidate her; and was conducting a negative campaign against her, while, in turn, she was focused on her job. Id. at 16. De Jesús also stated that during his communications with Cortez, he had become insubordinate, threatening and defying. Id.

After Torres' complaint, two other employees, Mariela Mercado ("Mercado") and Quiñones, presented unrelated complaints against the store management about favoritism in the manner in which management handled certain operational issues, such as scheduling of work shifts, disciplinary measures and assignment of lunch breaks. Id. at 14. As a result, Cátala called Ramos and requested that Human Resources perform an independent investigation of the situation at the Mayagüez store to assess the source of the discontent. Id.

During the months of April and May 2008, Vélez and Ramos, who was in charge of Employee Relations, visited the Mayagüez Store to conduct an investigation. Id. at 17-18. Specifically, they investigated the allegations set forth in the three (3) complaints and the issues raised by De Jesús and Cátala. Id. at 17. The investigation was aimed at determining the source of the discontent, identifying areas that needed improvement and creating a management improvement plan, if warranted. Id. The interview process took several visits since Vélez and Ramos individually interviewed all employees that were working at the store during that time, including Cortez. Id. at 18. They took notes during the interviews, which were later reviewed and initialed by the employee/witness. Id.

During her interview, Torres reiterated the complaints she set forth in the letter against Cortez. Id. at 19. She further complained that Cortez would threaten her saying: "you are going to get fucked, I am doing satanic rituals," and thereafter would start talking in a weird language; he used foul language like "cabrona" (bitch) in front of clients; he accused her of stealing sales

and being tricky ("truquera") in front of clients, who left the store disgruntled; he would create ill will against her among the employees, accusing her of stealing sales; he would gather with his friends and say "look at this asshole, we are going to get her fired, I have spoken with clients to get her fired"; he monitored all of her sales transactions to see how much she sold; he turned Quiñones against her; he looked at her in a menacing way; that she felt harassed by Cortez and uncomfortable working next to him. Id. Torres further complained that when she was pregnant, Cortez threatened with performing satanic rituals on her so she would have a miscarriage. Id. at 20. When Torres later had problems with her pregnancy, she believed the rituals were working. Id. She also indicated that Cortez manipulated employees to turn them against her. Id. at 21. Torres also indicated Cortez's harassment had gone about for years. Id. at 20. She did not, however, remember the specific date when Cortez's harassing behavior began. AUF at 5.

During the investigation, several employees also set forth additional complaints about Cortez. SUF at 22. During his interview, Bryan González ("González") stated that Cortez told him that he wanted to get Torres fired for stealing sales and that he would not rest until he got her fired; told him personal and negative things about Torres; accessed Torres' computer to challenge her marketing transactions and check if the process was correct; would question and challenge Torres' transactions; and after verifying Torres' transactions, Cortez would approach him (González) and tell him Torres was stealing again. Id. at 23. Gonzalez further stated that he saw Torres trembling when Torres confronted her and questioned her about her transactions, yet she did not say anything; that when Torres was performing a transaction, Cortez would hit the escape key on her computer eliminating the record from the screen; that Cortez manipulated Quiñones to do what he wanted; that Torres did her job and had the ability to sell; that the situation between Cortez and Torres arose because Cortez envied her; and that the situation had gone too far and having someone like Cortez at the store was not good. Id.

González also reported that Cortez told him in more than one occasion that he wanted to kill someone; that Cortez liked to intimidate people; would curse when he fell behind in sales; would speak in a weird language and then explained that he was praying to Satan; liked to create ill-will and criticize everything; would boast that nobody in Centennial could fuck with his life or otherwise they would have to pay him a lot of money; and bragged that he was untouchable. Id. at 26.

Gabriel Rivera Quijano ("Rivera Quijano") also expressed that Cortez made religious comments at work. Id. at 28. Specifically, he stated that while he respected Cortez's beliefs, Cortez would criticize and poke fun at Christians ("tirándole a los Cristianos") whenever he was around; that one day Cortez started talking in tongues in front of him and then said the Devil had ordered him to say that; that Cortez talked openly about his beliefs to challenge those of others; and that he felt uncomfortable with Cortez's comments. Id.

As part of the investigation, De Jesús and Ryan Polanco ("Polanco"), Supervisor at the Mayagüez Store, stated that Cortez constantly monitored all of Torres' transactions and would ask the store management to let him audit her contracts, insisting that she stole sales from her co-workers. Id. at 24. They further noted that Cortez expected that all of his prospects be respected indefinitely, when the rule was that a salesperson was entitled to the commission generated by a prospect if the services and products were obtained within seven days of the prospect's original visit. Id. De Jesús indicated that Cortez had a defying conduct and had problems with Torres for a long time. Id.

Luis Bayón ("Bayón") stated that Cortez had a constant war against Torres and tried to get others involved in his mobbing; that whenever Torres was not at her desk, Cortez and Quiñones would sit at her computer, access her clients' files, check her transactions and tried to wreak havoc; that Cortez controlled Quiñones; that Cortez and Quiñones were problematic and their

treatment of Torres was creating a tense work environment; and that Cortez had a negative attitude. Id. at 25. Prior to this investigation, and except for Torres' written complaint, none of the employees had previously filed formal complaints against Cortez. AUF at 2.

After the first round of interviews were conducted, Vélez prepared a summary of the entire investigation and provided it to Ramos for review and the appropriate action. SUF at 29. During the interviews, Vélez could not confirm the complaints made against management in the letters sent by Mercado and Quiñones, since most of the employees denied favoritism and expressed that management was fair. Id. at 30. Nevertheless, Vélez pointed out to management several areas that could be improved, such as scheduling, cleanliness, uniformity of disciplinary measures and lunch breaks, among others. Id. at 31. Vélez and Ramos discussed these recommendations with Cátala who, in turn, discussed them with De Jesús and Polanco. Id.

Ramos also discussed the investigation's findings with Vélez, Gloria Cruz ("Cruz"), Human Resources Vice President, Cátala, and Enrique Niggeman ("Niggeman"), Centennial's Sales Director. Id. at 32. Therefore, although Cátala was not involved in the investigation process that led to Cortez's termination, he was consulted by Ramos, Cátala and Cruz prior to Cortez's suspension. Id. at 80. They decided to suspend Cortez pending further investigation of the allegations made against him. Id. at 32-33. Consequently, Cortez was suspended effective June 27, 2008. Id.

Vélez, Cátala, De Jesús and Polanco held a meeting to inform Cortez that he would be suspended pending further investigation of the allegations against him. Id. at 34. Vélez informed Cortez of the complaints presented against him, specifically that he was verbalizing threats, that he was intimidating or threatening people with harm and that he was making inappropriate religious remarks in the workplace. Id. Cortez reacted in a very hostile manner, leaning forward towards Vélez, slamming his fist against the table, raising his voice and denying any wrongdoing.

Id. at 35. Cátala eventually calmed him down. Id. On June 27, 2008, Quiñones and ISR's Liz Velázquez and Mercado were also admonished, since the store employees stated that they were creating a tense environment at the store. Id. at 36.

Following Cortez's suspension, Vélez conducted additional interviews. Id. at 37. During the second round of interviews, Torres again complained of the following: she could not interact with her co-workers when Cortez was at the store because every time she helped them, he would tell them she did it to steal their sales; because of that situation, Torres did not talk to anyone; whenever he did not meet his sales quota, Cortez would threaten Torres saying she was going to get screwed, and would then start talking in a weird language; when Torres experienced complications during her pregnancy, Cortez said to Torres: "you see? It is working;" although ISR's do not have assigned work stations, when Torres sat in a work station in order to assist a client, Cortez would insistently ask her to move in an authoritative tone in front of the client and she would end up moving with her client to another desk; Cortez intimidated her with his unintelligible language and his satanic rituals; some days he would stand at the store entrance and announce "today I would kill someone", and "today I feel like killing"; Cortez threatened Torres with getting her fired (he would say: "you'll see, I am going to get you fired. You'll see I am going to accomplish it!,"); Cortez yelled at her in front of clients; accused her of stealing sales, and as a result, clients left, telling them to solve their differences amongst themselves. Id. at 38. According to Torres, although Cortez's harassment had been taking place for a long time, she did not complain before because she was intimidated by Cortez, and wanted to avoid problems with her supervisors. Id. at 39. She further stated that Cortez waited until there was nobody around and would then harass her; he would tell her that nobody would believe her because he had worked for Centennial for ten years and they would believe him instead of her. Id. Torres explained that she decided to write the letter complaining about Cortez because she got tired of dealing with him and

his threats. Id.

    Several employees also stated that Cortez argued and fought with Torres in front of clients; created ill will against Torres among everyone at the store; told employees to watch their backs because Torres stole their sales; would make negative comments about Torres with Quiñones, Velázquez and Mercado; and employees would not dare to talk to Torres because Cortez would give them a "look," or he would stand next to them and say that the shadows had already told him what had happened or what had been said. Id. at 40.  Several employees further informed that Cortez would make comments like: "today I do feel like killing someone"; "today I would kill someone"; and "today I will kill someone." Id. at 41.

    Some employees also stated the following about Cortez:  "He intimidates with his weird language and with his supposed rituals and he had me intimidated, and I did not dare to complaint. I felt anguished"; "employees don't say anything to avoid confrontations with him. They are afraid of him and prefer to be in his good side"; "some co-workers could refuse to say things because they are afraid of him"; "the team refuses to say many things because they felt intimidated by him, he was a bouncer and he talked a lot about fights, about how he broke someone's nose, or that made that other person disappear, etc. That was the image he reflected to others and people get scared";  Cortez "would say that when the Devil is inside of him, that there is no stopping him, [and] with that image nobody wanted to confront him"; when Cortez did not agree with something, he was aggressive, raised his voice, and gestured with his hands, etc.; and "he psychologically intimidate[d] people." Id.  at 42.

    Moreover, some employees said that Cortez made religiously charged comments, for example: he always talked about how the world was going to end in 2012 and looked for information in the Internet to prove it; he said he was preparing "something," that he is opening doors, that he has an altar, and that it would come soon; he said that when the Devil enters his

body, there is no stopping him; during Torres' pregnancy he threatened her with using satanic rituals to harm her unborn baby, and when she experienced complications he said, "see? It's working;" he would speak unintelligibly in front of employees and then say that Satan had ordered him to do it; in front of his co-workers, he would look for ways to cite the Bible and prove to Christians that God did not exist; and tried to impose his religious beliefs on others, to the point where another employee asked him several times to stop discussing that issue. Id. at 43.

Lastly, several employees stated that the work environment after Cortez was suspended was more peaceful and less tense. Id. at 44. Specifically, employees described the environment without Cortez as: (1) much quieter, less tense; you can work as a team (2) you can breathe peace and tranquility; (3) super relax; (4) feels quieter, more peaceful, less tense; (5) you don't feel the negative environment anymore; (6) I see Cortez like the head of the band, when he is not here, everything fell back into place; and (7) the time he has been out, it is a big difference, there is more companionship. Id. at 45. Torres also indicated that during Cortez's suspension the environment was more peaceful and that she was able to share with Quiñones as well as the rest of the team; that she could not share with her co-workers before because Cortez would go to the employees and say that she talked to them to steal their sales. Id. at 46. After concluding the second round of interviews, Vélez provided additional feedback to management. Id. at 47.

Upon conclusion of said portion of the investigation, Ramos then reviewed Cortez's personnel file. Id. at 48.

*Cortez's Personnel File*

Prior to the complaint presented against him in March 2008, Cortez had been disciplined on several occasions. Id. at 49. Although Centennial awarded Cortez a salary increase every year that he worked for the Company, the record showed previous disciplinary actions related to his attendance and tardiness. Id. at 48 & 71. He had also been disciplined for behaving disrespectfully

towards his superiors, failing to follow grooming standards and for failing to meet his sales quota. Id. at 48. Moreover, his evaluations showed that he needed improvement in the areas of interpersonal relationships with others and leadership, needed to focus on his work and avoid conflicts with his co-workers. Id.

In 2004, Cortez was advised that even if he disagreed with Centennial's policies, he was prohibited from making negative comments in front of his coworkers or during group meetings. Id. at 49. Specifically, in a sales group meeting, Cortez made a comment addressed to John de Armas, Centennial's President at the time, to the effect that "if he thought that with those pretty words I am going to sell more…." Id. Cortez was further advised to provide constructive criticism, rather than expressing his opinion in a negative way. Id. He was also warned that this type of conduct would result in further disciplinary measures including his termination.  Id. Moreover, in August 2004, Cortez was admonished because he would show up to work with his shirt untucked and without his tie. Id.

Cortez also received various warnings because of his tardiness. Id.  Nevertheless, he continued to arrive late to work. Id. As a result, on November 30, 2004, he was suspended for three (3) days without pay by his supervisor at the time, Militza Santos ("Santos"), because his tardiness was affecting the store's operations; specifically, from January 1 to November 30, 2004, Plaintiff had been late to work fifty three (53) times. Id. Throughout his tenure at Centennial, Cortez was also reprimanded on several occasions for failing to achieve his sales quota. Id. On March 26, 2008, Cortez was disciplined for missing a sales meeting without prior authorization. Id.

In Cortez's FY1999-2000 performance appraisal form, his supervisor at the time, Juan Picón, commented that Cortez needed "to avoid conflicts, work as a team and communicate more effectively…. Must improve largely his punctuality…. Needs a radical change in behavior, attitude

and commitment. Improve quality of the work. Be punctual." Id. He was rated as "Needs Improvement" in areas of behavior and communication. Id. In Cortez's FY2003-2004 performance appraisal form, Cortez's performance was evaluated by Santos, then supervisor, as "Marginal" in several areas of responsibility, to wit: (1) Continuous Improvement; (2) Initiative; (3) Innovation; (4) Planning and Organization; and (5) Flexibility and Adaptability. Id. She commented that he needed to provide criticism of the procedures in a positive way. Id.

In Cortez's FY2005-2006 performance appraisal form, his supervisor at the time, Waica Nazario ("Nazario"), rated Plaintiff's performance as "Marginal" in nine (9) out of seventeen (17) total areas of responsibility: (1) Accountability; (2) Continuous Improvement; (3) Dependability and Reliability; (4) Initiative; (5) Teamwork/Interpersonal Skills; (6) Planning and Organizing; (7) Productivity (8) Continuous Learning and Development, and (9) Flexibility and Adaptability. Id. Plaintiff refused to sign the evaluation. Id. In said performance appraisal form, Nazario also commented that "in the teamwork area, interpersonal relationships must be improved with team workers in sales, maintaining a work environment of respect and cooperation." Id. Cortez did not deny Nazario's comments; instead he explained that his conduct was due to "other co-workers that do not respect the sales of others, which has been informed even to Human Resources…" Id. During Nazario's deposition, she also stated that Cortez had some friction with other employees while he worked under her supervision. Id.

In Cortez's FY2006-2007 performance appraisal form, Nazario once again rated his performance as "Marginal" in several areas: (1) Initiative; (2) Innovation; and (3) Leadership. Id. In Cortez's FY2007-2008 performance appraisal form, Polanco, Cortez's supervisor at the time, rated his performance as "Marginal" in eight (8) out of seventeen (17) areas: (1) Responsibility; (2) Continuous Improvement; (3) Initiative; (4) Innovation; (5) Team Work and Interpersonal Relationships; (6) Leadership; (7) Client Service; and (8) Flexibility and Adaptability. Id. Polanco

further rated Cortez's attendance as Unsatisfactory. Id. Also, in Cortez's FY2007-2008 performance appraisal form, Polanco encouraged Cortez "to use his long tenure with the company to motivate his coworkers, by giving the example, and not the contrary." Id.[2]

Cortez also defied supervisors in his evaluations. Id. Specifically, in the 2005-2006 evaluation, after Nazario encouraged him to "establish a daily work plan and to keep himself informed of all the changes and new products…", Cortez replied: "… I have always had my own way of doing my job and in 8 ½ years it has worked for me." Id.

*Cortez's dismissal*

As a result of the aforementioned investigation, employee interviews and upon review of his prior performance and disciplinary record, Cortez was terminated on August 27, 2008. Id. at 50. Decisions to terminate employees in Centennial can never be reached unilaterally by one person. Id. at 51. Thus the decision to terminate Cortez was reached after a consultation process between Ramos, Cruz and Nieggeman. Id. On April 8, 2009, Plaintiff filed the verified complaint against Centennial before this Court. Id. at 72.

During the discovery proceedings in the present case, Cortez admitted that he was aware that Centennial's Associates Manual established a policy prohibiting discrimination and any kind of harassment in the workplace, including religious discrimination. Id. at 52. Cortez knew,

---

[2]   According to Centennial's performance appraisal form, the area of Team Work and Interpersonal Skills (rated as marginal in various occasions) requires the employee to "achiev[e] superior business results by working collaboratively with others in and out of [their] respective department [and to] [treat] others with respect and dignity." Id. Also, according to Centennial's evaluation system, the "Dependability and Reliability" (rated as marginal) is defined as: "Can be counted on to support the team." Id. Pursuant to the evaluation system, the "Leadership" area (rated as Marginal in some occasions) is defined as: "Gains commitment to Centennials Business Objectives; guiding Principles and Values. Builds a cooperative and effective work group. Sets the example."). Id. According to Centennial's performance appraisal form, "Marginal" is defined as "performance [that] is below the standards of the requirements of the position, and improvement is expected." Id.

throughout his tenure with Centennial, that Centennial's Associates Manual also prohibited being disrespectful towards employees, supervisors and clients, as well as making verbal and physical threats towards others. Id. at 53. He also admitted that he was aware that he could be disciplined or terminated depending on the severity of the violations; that he was aware that according to Centennial's Associates Manual, mistreating, threatening, fighting with, screaming at, and using foul language against coworkers also constituted a severe violation that could lead to termination; and that he believed that consistently threatening an employee with getting them fired; accusing her of stealing and doing so in front of clients; monitoring all her transactions and saying "my shadows are working" if credit was not approved, would constitute harassment that violated the Company's policies and justified termination. Id. at 53, 54 & 55.

Cortez also knew that imposing his religious beliefs on other employees would violate Centennial's policies. Id. at 56. Similarly, he was aware that threatening others with comments like: (1) "you will be fucked, I am making satanic rituals" ("te vas a joder, estoy haciendo rituals satánicos"); and (2) threatening an employee with harming her baby while she was pregnant and saying that it's working when she had pregnancy complications, constituted a severe violation of Centennial's policies that justified termination. Id. at 57. Cortez further admitted that making threatening comments like: "today I would kill someone" or "today I feel like killing", would justify his termination. Id. at 58. In sum, Cortez acknowledged that if the complaints presented against him were true, Centennial would have sufficient grounds for terminating his employment. Id. at 59.

Pursuant to Polanco's deposition testimony, he supervised Cortez for many years and was present at the Mayagüez store for more than forty (40) hours a week. AUF at 3. According to Polanco, he never filed any kind of written complaint against Cortez because of his performance; did not receive any complaints about Cortez's behavior at the store; never heard Cortez threaten

any coworker; and Torres never came to him with any complaint against Cortez. Id. He further stated that, as supervisor, he would stop any conduct of that nature. Id. De Jesús also stated that if an employee filed a complaint, he would meet with the offending employee and report it to Human Resources. Id.

       *Sanctions upon other employees*

       After the conclusion of the investigation, Cátala and Vélez also met with employees Quiñones, Velázquez and Mercado. Id. at 60. The results of the investigation were discussed with them and all three were disciplined in writing. Id. These employees were also warned that further disruptive conduct would entail further disciplinary measures, including termination. Id. The difference in disciplinary actions imposed upon said employees and Cortez was due to the difference in severity of their conduct and each employees' disciplinary history. Id.

       *Cortez's religious beliefs*

       Cortez describes himself as a "Catholic-Satanist" who prays to the Devil. Id. at 61. He believes in God and the Devil, but he prays to the Devil. Id. As part of his religion, Plaintiff is not required to use any particular clothing or to have a particular personal appearance. Id. at 62. Cortez admitted that he does not have to be a Satanist to: (1) say "today I feel like killing someone"; or (2) to say "whenever the devil is inside of me I become uncontrollable." Id. at 63. Most employees in the Mayagüez Store and in Centennial knew about Cortez's religious beliefs and that he is a Satanist. Id. at 69.

       Cortez alleges that he was terminated because he is a Satanist and that his termination letter made reference to him threatening people with performing satanic rituals to harm them. Id. at 64. Cortez, however, admitted that the only time Vélez mentioned Cortez's religious beliefs during the investigation was when she told him about the accusations that were presented against him and in the context of discussing his co-workers' allegations that he threatened with the use

of satanic rituals against others. Id. at 65 & 88. According to Cortez, one of his supervisors, Teresita Velázquez ("Velázquez") inquired about his religious beliefs in year 2002, whereupon he replied that he worshiped Satan. Id. at 66. After the alleged meeting, all employees knew about his religious beliefs. Id. Notwithstanding, Cortez continued to work at Centennial without incident, and thereafter, Vélazquez gave Plaintiff a very good evaluation rating ("Consistently meets expectations.") Id. at 67-68. Cortez never complained about the alleged meeting with Velázquez in 2002 to Centennial or to the Equal Employment Opportunity Commission ("EEOC"). Id. at 70. The first time he complained about that meeting was when he filed the instant complaint. Id.

After his dismissal, on December 13, 2008, Cortez filed an administrative charge before the EEOC. Id. at 84. However, he did not sign the charge under penalty of perjury. Id. Cortez's EEOC charge alleged that Vélez had asked him about his religious beliefs during the investigation. Id. at 85. Yet, in his deposition he did not recall whether Vélez asked him about his religious beliefs during the investigation. Id. He denied informing Vélez that he was a Catholic Satanist. Id. The alleged inquiry by Vélez regarding Cortez's religious beliefs (as stated in his EEOC charge) was not mentioned in his complaint. Id. at 86.

In the EEOC charge, Cortez alleged that his problems at Centennial began after he revealed his religious beliefs to Vélez in 2008. Id. at 87. The complaint, however, indicates that he revealed his religious beliefs on 2002, and thereafter, everybody knew about his beliefs. Id. at 87.

*Nazario's testimony*

Pursuant to Nazario's Unsworn Statement, she was "one of Irving Cortez's supervisors at the time he worked at the Centennial Mayagüez Store." Id. She was Cortez's direct supervisor for a period of approximately two years. Id. at 73. According to Nazario, she witnessed "conversations between other Centennial supervisors in which they stated that they wanted Irving

Cortez fired from Centennial because they feared his particular religious views." Id. at 74. In her deposition, Nazario explained that her unsworn statement referred to a conversation between Cátala, Santos and her at the Mayagüez Store, while she was Cortez's supervisor and Santos was the Store Manager. Id. at 75 & 77. She states that said conversation was held to discuss Cortez's suspension for tardiness,[3] during which Cátala allegedly stated the following: "that that was the beginning. They already had one (1) reason to suspend him, that what she [Santos] has to do was to continue on top of him until she would be able to find more reasons that could be documented, so that then an employment termination could be attained... [Cátala] told [Santos] that he simply didn't like him, his way of being and his beliefs." Id. at 76 & 78;. AUF at 12.[4]

As supervisor, Nazario knew that Centennial prohibited all kinds of discrimination, and that she was in charge of enforcing said policies. Id. at 81. Nazario, however, did not notify the alleged conversation to the Human Resources Department or to anyone at Centennial. SUF at 79. She was terminated by Centennial on June 28, 2007. Id. at 82. After said date, Nazario did not visit any Centennial office nor was in contact with anyone at Centennial. Id. at 83. As such, she does not have information about any Cortez's performance after her termination nor any disciplinary measures enforced against him. Id. at 83.

**Applicable Law and Analysis**

Title VII explicitly protects employees from adverse employment actions on the basis of religion. On this point, it provides that "[i]t shall be an unlawful employment practice for an

---

[3]  According to Cortez's personnel file, the only suspension for tardiness he received occurred on November 30, 2004. Id. at 76. The memo for suspension was given by Santos and was signed by Nazario as a witness. Id.

[4]  Although the parties dispute whether Nazario remembered the date the conversation allegedly took place, the record shows that she did not remember the exact date but upon further questioning conceded it probably took place in June 2006.

employer ... to ... discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . ." 42 U.S.C. § 2000e-2(a).

Absent direct evidence of discrimination, the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803-805 (1973), applies in these types of cases. Under the *McDonnell Douglas* scheme, the plaintiff must first establish, by a preponderance of the evidence, a "prima facie" case of discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993) (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-253 (1981)). Generally, a plaintiff alleging discriminatory discharge generally bears the initial burden of showing (i) that he is a member of the protected class; (ii) that his work met defendant's legitimate work expectations; (iii) that, despite his performance, he was discharged; and (iv) that, after his discharge, defendant replaced him with someone outside the protected class. St. Mary's, 509 U.S. at 506; McDonnell Douglas, 411 U.S. at 802.

In analyzing claims of religious discrimination, sister circuits have also used the *McDonnell Douglas* scheme. Specifically, to establish a *prima facie* case for unlawful discharge, "the plaintiff must show the following: (1) that he was subjected to some adverse employment action; (2) that, at the time the employment action was taken, the employee's job performance was satisfactory; and (3) some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs." Defreitas v. Horizon Inv. Mgmt. Corp., 577 F.3d 1151, 1162 (10th Cir. 2009).[5]

---

[5] Courts have generally recognized that employees may assert two theories of religious discrimination: "disparate treatment," and "failure to accommodate." Abramson v. William Paterson College, 260 F.3d 265, 281 (3rd Cir. 2001); see also Chalmers v. Tulon Co. of Richmond, 101 F.3d 1012, 1017 (4th Cir. 1996); Mann v. Frank, 7 F.3d 1365, 1368-70 (8th Cir. 1993). Essentially, in order to prove disparate-treatment, a

The "establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." St. Mary's, 509 U.S. at 506 (citing Burdine, 450 U.S. at 255, n. 8). This "presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case -- i.e., the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" Id. at 506-507 (citing Burdine, 450 U.S. at 254). That is, the defendant must set forth admissible evidence which shows that unlawful discrimination was not the cause of the employment action. Id. If the defendant carries his burden of persuasion, the presumption is rebutted and "drops from the case." Burdine, 450 U.S. at 255, n. 10.

The plaintiff must then show that the defendant's proffered reason is a pretext, to wit, that it is not the real reason for the employment decision. Id. at 256. In this context, pretext "means more than an unusual act; it means something worse than business error; pretext means deceit used to cover one's tracks." Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 67 (1st Cir. 2008) (citing Ronda-Perez v. Banco Bilbao Vizcaya Argentaria, 404 F.3d 42, 45 (1st Cir. 2005)). Courts have noted that "although the McDonnell Douglas presumption shifts the burden of production to the defendant, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" St. Mary's,

---

"plaintiff must establish 'that the defendant had a discriminatory intent or motive' for taking a job-related action." Ricci v. DeStefano, 129 S. Ct. 2658, 2672 (2009) (citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986 (1988) (superseded on other grounds)).

Several circuits have held that "[t]o prove a claim under the 'disparate treatment' theory, the prima facie case and evidentiary burdens of an employee alleging religious discrimination mirror those of an employee alleging race or sex discrimination." Abramson, 260 F.3d at 281 (citing Chalmers, 101 F.3d at 1017). In order to establish a prima facie case of disparate treatment, the employee must show that "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably." Berry v. Dept. of Social Serv., 447 F.3d 642, 656-657 (9th Cir. 2006); Lubetsky v. Applied Card Systems, 296 F.3d 1301, 1305 (11th Cir. 2002).

509 U.S. at 507 (citing <u>Burdine</u>, 450 U.S. at 253).

As to the evidence needed to show pretext, the Supreme Court has held that proof that the employer's explanation is "unworthy of credence" is one form of "circumstantial evidence that is probative of intentional discrimination." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 147 (2000); <u>see also</u> <u>Velazquez-Fernandez v. NCE Foods, Inc.</u>, 476 F.3d 6, 12 (1st Cir. 2007). It is not, however, enough "'for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real [and unlawful] motive of discrimination.'" <u>Vélez v. Thermo King de P.R., Inc.</u>, 585 F.3d 441, 452 (1st Cir. 2009) (citing <u>Azimi v. Jordan's Meats, Inc.</u>, 456 F.3d 228, 246 (1st Cir. 2006)).

On this issue, the First Circuit has pointed out that "[a]n employee can establish pretext 'by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could infer that the employer did not act for the asserted non-discriminatory reasons.'" <u>Carreras v. Sajo</u>, 596 F.3d 25, 37 (1st Cir. 2010) (citing <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 56 (1st Cir. 2000)). Pretext can also be established by showing that the employer's "nondiscriminatory reasons were after-the-fact justifications, provided subsequent to the beginning of legal action." <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 56 (1st Cir. 2000). Another method to show pretext is to demonstrate "that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker." <u>Santiago-Ramos</u>, 217 F.3d at 55. (1st Cir. 2000). Furthermore, "evidence of a company's general atmosphere of discrimination 'may be considered along with any other evidence bearing on motive in deciding whether a Title VII plaintiff has met her burden of showing that the defendants' reasons are pretexts.'" Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000)

(citations omitted).

Similarly, "[a]n employer's disparate treatment of employees in response to behavior that legitimately offends the employer can provide evidence of discriminatory animus." Thermo King, 585 F.3d at 451. Nevertheless, "in order to be probative of discriminatory animus, a claim of disparate treatment 'must rest on proof that the proposed analogue is similarly situated in material respects.'" Id. (citing Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 752 (1st Cir. 1996). Although the comparison need not be perfect replicas, "they must closely resemble one another in respect to relevant facts and circumstances." Garcia v. Bristol-Myers Squibb Co., 535 F.3d 23, 31 (1st Cir. 2008) (citations omitted).

It should be noted, nevertheless, that even "[d]iscrediting defendant's proffered reasons does not automatically entail a finding of age discrimination." Machin v. Leo Burnett, Inc., 376 F. Supp. 2d 188, 200-201 (D.P.R. 2005). Therefore, even a plaintiff's showing of pretext does not necessarily defeat a defendant's summary judgment motion. Such finding requires "sufficient evidence in the record for a reasonable factfinder to infer..." that the employee's termination was due to discriminatory animus. Id. On this point, the Supreme Court has stated, "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000). Some factors to be considered in determining the sufficiency of a plaintiff's claims "include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." Id. at 148-49.

In the motion for summary judgment, Centennial argues that Plaintiff fails to meet the second element of the *prima facie* case, to wit, that his performance was satisfactory. They

further contend, that even assuming *arguendo*, that Plaintiff established a *prima facie* case, they have articulated and established a legitimate business reason for his dismissal. According to Centennial, Cortez merely denies Centennial's allegations and attacks the investigation conducted by the Human Resources Department without adequate proof. Centennial also points out that there is no evidence to suggest that the decision to dismiss Cortez was based on discriminatory animus instead of the investigation's findings and his disciplinary record.

In his opposition, Cortez first argues that his performance reviews demonstrate that he was qualified for his position and adequately performed his functions. He further contends that Centennial's proffered reasons for his dismissal are pretextual. In support thereof, Cortez avers that certain Centennial supervisors and Human Resources personnel conspired against him, and their actions eventually led to his termination. He also questions the validity of the investigation conducted by the Human Resources Department.

*Pretext*

The First Circuit has held that "[o]n summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus." Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996). Moreover, in disparate treatment cases, comparative evidence is to be treated as part of the pretext analysis, and not as part of the plaintiff's *prima facie* case. Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003). Accordingly, this Court will assume that Plaintiff has made out a *prima facie* case, and thus we will address whether Defendant's proffered reason for Cortez's dismissal is a pretext. In the present case, Defendant alleges a legitimate, non-discriminatory reason for firing Cortez, to wit, his disruptive behavior at work and disciplinary history. Bristol-Myers, 535 F.3d at 31.

Even finding that Plaintiff established a *prima facie* case, that is, that he met his employer's legitimate work expectations, and considering "instead, whether there is evidence that, notwithstanding the employer's stated reasons for the termination, the real reason, at least in part, was ... discrimination,'" we find that there is no evidence from which to conclude that Defendant's proffered reason for Cortez's termination was not in fact the real reason. Fontanez-Nunez v. Janssen Ortho LLC, 447 F.3d 50, 56 (1st Cir. 2006) (citing Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 31 (1st Cir. 2003)).

As previously mentioned, at the pretext stage, "the trier of fact proceeds to decide the ultimate question: whether plaintiff has proved "that the defendant intentionally discriminated against [him]..." St. Mary's, 509 U.S. at 511 (citing Burdine, 450 U.S. at 253). The First Circuit has emphasized that the "'ultimate touchstone' of the *McDonnell Douglas* analysis is whether the employer's actions were improperly motivated by discrimination." Ugurhan Akturk Kosereis v. Rhode Island, 331 F.3d 207, 213-214 (1st Cir. 2003) (citing Fite v. Digital Equip. Corp., 232 F.3d 3, 7 (1st Cir. 2000)). This follows the fact that "[o]ur laws are designed to ensure against discrimination and retaliation, not 'inaccuracy by an employer.'" Carreras, 596 F.3d at 37 (citing Rivas Rosado v. Radio Shack, Inc., 312 F.3d 532, 535 (1st Cir. 2002).

Although Cortez argues that Defendant's articulated reasons for his termination are a pretext and that he was terminated because of his religious beliefs, "when assessing a claim of pretext in an employment discrimination case, a court's focus is necessarily on the motivations and perceptions of the decisionmaker," Davila v. Corporacion De P.R. Para La Difusion Publica, 498 F.3d 9, 17 (1st Cir. 2007), that is, "whether the employer believes its stated reason to be credible." Mesnick v. General Electric Co., 950 F.2d 816, 824 (1st Cir. 1991) (citing Gray v. New England Tel. and Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986)); see also Kouvchinov, 537 F.3d at 67. Thus, "the issue is not whether [the employer's] reasons...were real, but merely whether the

decisionmakers… believed them to be real." Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 674 (1st Cir.1996); see also Morales-Figueroa v. Banco Bilbao Vizcaya Argentaria, 550 F. Supp. 2d 220, 226-227 (D.P.R. 2007) (citing Ronda Perez v. BBVA, 404 F.3d 42, 45 (1st Cir. 2005)) (pointing out that in an age discrimination suit, "[t]he question is not whether plaintiff's or his fellow employees' version is the true one, but whether...his superiors believed what [they] had been told by those [they] interviewed."). Therefore, an "employee's perception of himself . . . is not relevant. [Rather,] [i]t is the perception of the decision maker which is relevant." Torrech-Hernandez v. GE, 519 F.3d 41, 49 (1st Cir. 2008). Similarly, when analyzing a claim of disparate treatment, courts "must focus on the actual knowledge and actions of the decision-maker." Lubetsky, 296 F.3d at 1306.

Courts have held that "[t]his holds true even when the decisionmaker is relying on information that may later prove to be inaccurate. In other words, it is not enough for a plaintiff to show that the decisionmaker acted on an incorrect perception. Instead, the plaintiff must show that the decisionmaker did not believe in the accuracy of the reason given for the adverse employment action." Kouvchinov, 537 F.3d at 67. This is due to the fact that "anti-discrimination laws do not insure against inaccuracy or flawed business judgment on the employer's part; rather, they are designed to protect against, and to prevent, actions spurred by some discriminatory animus." Id. (citing Ronda-Perez, 404 F.3d at 47).[6]

Pursuant to the uncontested facts, Cortez's dismissal was partially based on the results of

---

[6] There is controversy as to whether there was a sexual relationship between Cortez and Torres, insofar as she denies all allegations on this front. See AUF ¶ 7 & Docket # 51, p. 47. Notwithstanding, this is not relevant to Plaintiff's claims since Vélez, Ramos, Cátala, De Jesús and Polanco denied knowing about an alleged romantic relationship between Cortez and Torres. See Docket # 51, p. 47. Moreover, Cortez never informed Centennial about his alleged relationship with Torres. Id. Similarly, an alleged relationship between Torres and Cortez was never mentioned during the investigation. Id. As such, it was not taken into consideration in deciding to terminate Cortez.

the investigations conducted by the Human Resources Department. The termination letter expressly states that he was suspended due to complaints made by several employees during the initial investigation stemming from Torres' letter to Cátala dated March 13, 2008.  Specifically, Centennial cited disruptive and offensive behavior towards Torres, other employees and clients which were affecting the work environment.  In reaching their decision to terminate Plaintiff, Centennial further considered his employment record, which according to Centennial's policies, are properly taken into consideration when disciplining employees. See SUF at 5. Therefore, this is not a case in which the employer's "nondiscriminatory reasons were after-the-fact justifications, provided subsequent to the beginning of legal action." Santiago-Ramos, 217 F.3d at 56.  Thus there is no basis to conclude on these grounds that Centennial's proffered legitimate business decisions are a pretext, and instead Cortez's dismissal was motivated by discriminatory animus.

Additionally, Plaintiff fails to show that his employer's findings were inaccurate, unbelievable, idiosyncratic, or misleading, Carreras, 596 F.3d at 37 (citing Gray v. New England Tel. and Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986), nor that there was a general atmosphere of discrimination in the workplace, Santiago-Ramos, 217 F.3d at 55. Although Plaintiff argues that Centennial conspired against him, and that the investigation was part of said conspiracy, the truth is the record is devoid of evidence to support said allegation. The initial investigation at the Mayagüez store was conducted as a result of the allegations set forth by Torres in the March 2008 letter to Cátala. Centennial's prompt action regarding this matter and the results obtained from the investigation that ensued were not motivated by Cortez's religious beliefs and do not show any discriminatory animus on Centennial's part. Furthermore, the employees' complaints against Cortez suggested that he incurred in unacceptable conduct that had to be stopped immediately, and was not necessarily linked to Cortez's religious beliefs. As a result thereof, Centennial first

suspended Cortez until they concluded the investigation process, and after concluding the same, he was dismissed. Prior to his suspension and subsequent dismissal, Cortez never complained, nor does he now allege, that other employees or supervisors made any comments regarding his religion during his tenure at Centennial, or that he was discriminated against by other employees or his supervisors.

In trying to defeat Centennial's proffered reasons for his dismissal, Cortez further contends that Polanco and De Jesús stated that they did not witness the conduct described by the other employees. According to Cortez, this controverts his co-workers' allegations during the investigation and Centennial's alleged business reasons for his dismissal. It is, however, not surprising that Cortez's supervisors would be unaware of his alleged actions and comments towards his co-workers insofar as he would hardly behave in such a manner in front of his supervisors. Notwithstanding, Cortez's reliance on Polanco and De Jesús' statements is misplaced. Essentially, De Jesús stated that if an employee filed a complaint, he would meet with the offending employee and report it to Human Resources; which he did in this case in referring Torres' letter to management. He also indicated that Cortez had a defying conduct and had problems with Torres for a long time, which is evidenced by the complaints he filed against her with the Human Resources Department. Moreover, when he forwarded Torres' letter to management, De Jesús pointed out that Cortez was constantly monitoring Torres, that the situation was out of control, and was affecting other employees. Furthermore, although Polanco admitted that he never filed any kind of written complaint against Cortez because of his performance or behavior at the store, nor heard Cortez threaten any coworker, and Torres never came to him with any complaint against Cortez, both he and De Jesús stated that Cortez constantly monitored all of Torres' transactions and would ask the store management to let him audit her contracts, insisting that she stole sales from her co-workers. As such, Polanco and De Jesús do

not impugn the other employees' statement, and instead lends support to Centennial's allegations regarding Cortez's behavior. Therefore, Cortez's arguments on this front do not raise a genuine issue of fact as to the veracity of his co-workers' statements and Centennial's reliance on the same during the investigation.

We further note that courts have recognized the importance of temporal proximity between alleged discriminatory comments and the adverse employment action in these types of cases. Rios v. Aramark Corp., 139 F. Supp. 2d 210, 222 (D.P.R. 2001) (the Court held that a comment made by the company's director "raised a genuine issue of fact as to the possibility of plaintiff's dismissal being based on age related discriminatory animus, especially because it is contemporaneous to plaintiff's discharge."); Cardalda-Sanchez v. Universidad Carlos Albizu, No. 08-1819, 22 2010 U.S. Dist. LEXIS 13140, at 22 (D.P.R. Feb. 16, 2010) (finding that there was no evidence of discriminatory animus when the alleged discriminatory action occurred five years prior to the adverse employment action.). In the present case, it is uncontested that Plaintiff's supervisors knew about Cortez's religious beliefs throughout his employment at Centennial, and pursuant to the record, as early as 2002. Ironically, this advances Centennial's argument that despite knowing about his religious beliefs, Plaintiff continued working at Centennial and received overall satisfactory performance reviews, aside from several disciplinary actions regarding his tardiness and interpersonal skills and overall attitude at work.

As previously mentioned, Plaintiff does not allege nor submits evidence of any differential treatment or religiously motivated actions from Centennial aside from his dismissal. There is not a single reference to Cortez's religious beliefs aside from citations of his co-worker's allegations regarding comments made by Cortez during working hours. The only evidence submitted by Plaintiff is the alleged conversation between Catala and Nazario which took place approximately two years before his termination, and is thus insufficiently close in time to show discriminatory

animus.  Specifically, the alleged conversation between Cátala and Nazario took place on or around June 2006, that is, over two years before Plaintiff's termination.  Moreover, it should be noted that according to Nazario, the meeting's purported purpose was to discuss Cortez's suspension for tardiness. Notwithstanding,  as Plaintiff pointed out, the meeting took place in 2006, whereas the record shows that Cortez was suspended in 2004. In light of this  inconsistency and the fact that the alleged meeting is too far in time, this Court finds that this does not raise a genuine issue of fact as to whether Plaintiff's termination was based on his religious beliefs.

Furthermore, even if Centennial's decision to terminate Cortez may be considered unwise or hasty, this Court is convinced that it was not motivated by discriminatory animus. More so considering that Cátala nor Nazario made the decision to terminate Plaintiff. The First Circuit has noted that statements made by someone "who neither makes nor influences [a] challenged personnel decision are not probative in an employment discrimination case." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1ˢᵗ Cir. 2000) (citing Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 10 (1ˢᵗ Cir. 1990)). Lastly, Cortez fails to show that he was treated more harshly than other employees because of his religious beliefs. Other employees who incurred in inappropriate behavior were reprimanded instead of suspended because the severity of their conduct and their disciplinary records differed from Cortez's.

Based on the foregoing,  this Court finds that even if Plaintiff discredited Centennial's proffered reasons for Cortez's dismissal, there is no proof that his termination was because of his religious beliefs. It is well-settled that "federal law does not protect generally against arbitrary or unfair treatment in private employment, but only against actions motivated by listed prejudices ... Discrimination is a form of unfairness; but not all unfairness is discrimination." Sabinson v. Trs. of Dartmouth College, 542 F.3d 1, 4 (1ˢᵗ Cir. 2008) (citations omitted). Thus while Cortez may be entitled to other remedies due to his dismissal, Title VII's provisions are inapplicable to

the case at bar.

In light of the above, this Court finds that Plaintiff has failed to establish that genuine issues of material fact exist as to pretext. Accordingly, Centennial's request for summary judgment as to Plaintiff's religious discrimination claim is **GRANTED**.

### Supplemental state law claims

Having dismissed Plaintiff's federal law claims against Centennial, Plaintiff's state law claims are **DISMISSED without prejudice**. See Newman v. Burgin, 930 F.2d 955, 963 (1st Cir. 1991) (holding that "[t]he power of a federal court to hear and to determine state-law claims in non-diversity cases depends upon the presence of at least one 'substantial' federal claim in the lawsuit.").

### Other claims

As Defendant correctly points out, there is no state action in the present case. Accordingly, Plaintiff's constitutional claims are **DISMISSED with prejudice**. Similarly, Plaintiff's separate claim for intentional infliction of emotional pain fails insofar as the anti discrimination statutes properly address the damages sought by Plaintiff.  This district has held that "[e]motional distress is a matter which may be taken into consideration in determining the amount of damages to which plaintiff is entitled, but it does not give rise to an independent cause of action on the theory of a separate tort." Lopez-Mendez v. Lexmark Int'l, Inc., 627 F. Supp. 2d 66, 71 (D.P.R. 2009) (citing Soto-Lebron v. Fed. Express Corp., 538 F.3d 45, 58 (1st Cir. 2008). As such, Plaintiff's claim for intentional infliction of emotional distress is also **DISMISSED with prejudice**.

### Conclusion

Based on the foregoing, Defendant's motion for summary judgment is **GRANTED.**

In San Juan, Puerto Rico, this 18th day of November, 2010.

*S/ Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge